## No. 14,423.

### McKay *v.* State Board of Medical Examiners.

(86 P. [2d] 232)

Decided December 19, 1938.

Mr. W. Felder Cook, Mr. C. C. Moody, of counsel, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. Henry E. Lutz, Assistant, Mr. Donald F. Clifford, of counsel, for defendant in error.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

The State Medical Board revoked the license to practice medicine of John H. McKay. He sued out a writ of certiorari in the district court and that court affirmed the action of the board. To secure a reversal of the judgment McKay prosecutes a writ of error.

The charge on which the order of revocation was based set forth two grounds: First, that McKay was "guilty of grossly negligent or ignorant malpractice." Second, that he was "guilty of immoral, unprofessional or dishonorable conduct." The malpractice, and the immoral, unprofessional and hishonorable conduct were each alleged to consist of the following acts, to wit: In writing prescriptions for one Leonard Bell between September 16, 1933, and October 2, 1933, for 160 one-half grain morphine tablets. On the first, second, third and fourth prescriptions, each for 24 tablets, dated respectively September 16, 20, 23 and 24, it is alleged that McKay falsely stated that the prescription was given under exception one, article 85 of the regulations issued by the Commissioner of Narcotics under the authority of the Harrison Narcotic Drug Act, and that the patient was suffering from an incurable disease. In the fifth prescription, dated September 26, for 16 tablets it is alleged that he falsely stated on the prescription that said tablets were for the treatment of Leonard Bell for bronchial asthma and pulmonary tuberculosis, whereas they were in fact intended for satisfaction of the addiction of said Bell to narcotic drugs. In the

sixth prescription, dated September 29, 1933, for 24 tablets, it is alleged that he falsely stated that said tablets were for the treatment of the said Bell for bronchial asthma, pulmonary tuberculosis and temporary observation, whereas in fact they were intended for the satisfaction of the addiction of said Bell to narcotic drugs. In the seventh prescription, dated October 3, for 24 tablets, it is alleged that he falsely stated that said tablets were for the treatment of pulmonary tuberculosis and bronchial asthma, whereas in fact they were intended for the satisfaction of the addiction of said Bell to narcotic drugs.

It is further alleged in support of each of the charges that McKay dispensed to one Irene Swan narcotic drugs not in good faith in conformity with the provisions of the Harrison Narcotic Drug Act, but for the purpose of satisfying her addiction, 1,640 one-quarter grain morphine tablets during the month of October, 1935. It is further alleged in support of said charge that McKay was absent from the state of Colorado from December 26, 1935, to February 25, 1936, and that during said time he left with his office assistant, contrary to the provisions of the Harrison Narcotic Drug Act, a large number of undated prescriptions for certain patients to be delivered by his assistant from time to time and dated as of the date of delivery, namely, ten prescriptions to Fred Anders, five to Irene Swan, nineteen to Frank Carter, nine to Edgar A. P. Marshall, thirteen to William Fahey, twelve to Frank Calloway, and three to Mrs. J. S. Hyde. It is further alleged in support of each of the charges that McKay dispensed to one James B. Brown during the period from November 28, 1934, to January 28, 1935, 591 one-quarter grain morphine tablets, not in good faith and in compliance with the Harrison Narcotic Drug Act, but for the purpose of satisfying his drug addiction; and that he furnished to the said Brown in the period from January 28, 1935, to February 4, 1935, in the Physicians and Surgeons hospital, narcotic drugs ostensibly for the purpose of curing the addiction of said Brown, but in fact for the

purpose of satisfying his addiction; and that he dispensed to the said Brown from his office during the period from March 13, 1935, to April 9, 1935, 153 one-quarter grain morphine tablets not in good faith and in conformity with the provisions of the Harrison Narcotic Drug Act but for the purpose of satisfying his addiction.

The evidence taken on the hearing before the board, which is certified as a part of the record, shows the prescribing and dispensing of morphine in the quantities and to the persons named in the charge.

We are unable to find any evidence in the record that the persons named were not suffering from the particular diseases specified on the prescriptions, nor do we find any evidence that these diseases from which McKay says they were suffering were not incurable, nor do we find any evidence that they were not within section 1 of article 85 of the regulations of the Commissioner of Narcotics under authority of the Harrison Narcotic Drug Act. Section 1, article 85 of those regulations is as follows: "A prescription, in order to be effective in legalizing the possession of unstamped narcotic drugs and eliminating the necessity for use of order forms, must be issued for legitimate medical purposes. An order purporting to be a prescription issued to an addict or habitual user of narcotics, not in the course of professional treatment but for the purpose of providing the user with narcotics sufficient to keep him comfortable by maintaining his customary use, is not a prescription within the meaning and intent of the act; and the person filling and receiving drugs under such an order, as well as the person issuing it, may be regarded as guilty of violation of the law.

"Exceptions. Exceptions to this rule may be properly recognized (1) in the treatment of incurable disease, such as cancer, advanced tuberculosis, and other diseases well recognized as coming within this class, where the physician directly in charge of a bona fide patient suffering from such disease prescribes for such patient, in the course of his professional practice and strictly for legiti-

mate medical purposes, and in so prescribing endorses upon the prescription that the drug is dispensed in the treatment of an incurable disease; or if he prefers he may endorse upon the prescription 'Exception (1), article 85.' (2) A physician may prescribe for an aged and infirm addict whose collapse would result from the withdrawal of the drug, provided he endorses upon the prescription that the patient is aged and infirm, giving age; or if he prefers he may endorse upon the prescription 'Exception (2), article 85.' ''

The statute authorizing the board to revoke a license is section 13, chapter 109, '35 C. S. A. Among other grounds enumerated which warrant such action are: ''The conviction of a felony or of a crime involving moral turpitude,'' ''grossly negligent or ignorant malpractice,'' ''immoral, unprofessional or dishonorable conduct.''

We have held that a conviction in the United States court for the sale of morphine to an habitual user thereof for other than medicinal purposes is a conviction of a crime involving moral turpitude and warrants revocation of the physician's license. *White v. Board of Medical Examiners,* 70 Colo. 50, 197 Pac. 564. But that matter is not in issue here, for it is not charged that McKay has ever been so convicted.

It is charged that he was guilty of ''grossly negligent or ignorant malpractice'' and of ''immoral, unprofessional or dishonorable conduct.'' The board evidently proceeded on the assumption that it was sufficient if it found from evidence before it that there was a violation of the federal narcotic laws by McKay and that because a conviction of such violation in a court of competent jurisdiction carries with it the inference of moral turpitude as a matter of law, their finding of such violation has a similar effect. Such an assumption is erroneous. The board in a proceeding of this kind, until a conviction is shown, has no concern with the provisions of the Harrison Narcotic Law nor with the commissioner's regulations made pursuant to it. It is not vested with jurisdiction to try

alleged offenders for its violation and may not make its own finding of such violation and predicate either malpractice or immoral, unprofessional or dishonorable conduct on the fact of such violation which it finds. It does not follow that acts that are inhibited by the Harrison Narcotic Act may not be proper for the board's consideration where there has been no conviction, but where such acts are proven and relied upon as malpractice or immoral, unprofessional or dishonorable conduct, it must appear from competent evidence that they are acts of such character without regard to the violation of a law that inhibits them and without regard to whether there is any law that makes the doing of them an offense. That such is the proper holding is indicated by the quotation cited by counsel for the board in his brief from *Ramsay v. Shelton,* 329 Ill. 432, 160 N. E. 769: "A revocation of a license to practice medicine is not intended as punishment for any offense but for the protection of the public by the police power of the state."

██ If a law inhibits the prescribing of a drug it is of course the duty of a physician to obey the law, and if convicted of its violation by a court of competent jurisdiction he might with perfect propriety be held guilty of unprofessional or dishonorable conduct, if such violation is held also to involve moral turpitude even though the prescription might be enitrely proper in a case judged by medical standards alone. Treatment that is proper by correct medical standards does not constitute malpractice even though it amounts to a violation of law. Malpractice consists of a failure to exercise that degree of care and skill in diagnosis or treatment that may reasonably be expected from one licensed and holding himself out as a physician, under the circumstances of the particular case. In the case of *Jackson v. Burnham,* 20 Colo. 532, 39 Pac. 577, a suit against a physician for damages for malpractice, we used the following language: "Therefore, it became the important, if not the controlling question in the case, which of these respective theories was correct, since

the propriety of defendant's treatment of plaintiff depends upon which was the correct diagnosis, and whether defendant exercsied ordinary care and skill in examining the case, as well as in applying remedies. To determine this, resort must be had to the opinion of experts, based upon the ultimate facts as the jury may find them established by the weight of the evidence. * * * We think that the instructions, taken as a whole, correctly define the nature and extent of the obligation that a physician or surgeon assumes when he accepts employment in his professional capacity. They certainly embody the law on the subject as uniformly laid down by text writers and announced in the adjudicated cases. They state, in substance, that by holding himself out to the world as a physician and surgeon, he impliedly contracts that he possesses the reasonable degree of skill, learning and experience which good physicians and surgeons of ordinary ability and skill, practicing in similar localities, ordinarily possess; that in judging of the proper degree of skill in any given case, regard is to be had to the advanced state of the profession at the time; that he will use his skill with ordinary care and diligence according to the circumstances of the case, and is liable only for ordinary neglect; that he does not undertake to warrant a cure, but only to exercise a reasonable amount of knowledge, skill and care in diagnosing the case and in applying the remedies; and the jury are expressly told that if they should find that defendant brought to the treatment of plaintiff such ordinary degree of knowledge and such skill and judgment, the plaintiff could not recover.''

We call particular attention to the observation made in the foregoing quotation that to determine whether ordinary care was used in diagnosis and treatment ''resort must be had to the opinion of experts.'' In the case before us there is no expert testimony disclosed in the record that proves or tends to prove a failure properly to diagnose or to treat the disease of the various persons with respect to whom malpractice was charged. It is

not enough that the board may be composed of experts who applied their knowledge of diagnosis and treatment to the case in which malpractice is alleged. The statute under which the board acted, section 13, chapter 109, '35 C. S. A., provides for a review by the district court on certiorari, and on such review the court may determine whether the board regularly pursued its authority (section 338, Code of Civil Procedure), or abused its discretion, and such determination can be made only on the evidence appearing in the record. Obviously the reviewing court cannot be left to speculate on what was in the minds of the individual board members as constituting improper diagnosis or treatment.

■ Neither the regulations of the commissioner of narcotics of which we are advised by the record, the pertinent state statute, section 34, chapter 58, '35 C. S. A., nor the applicable federal statute, U. S. C. A., Title 26, §1044, subsection (c), paragraph (1), purports to limit the purpose for which or quantity of any drug that may be prescribed in good faith by a physician in treating a patient in the practice of his profession. Section 34, chapter 58, '35 C. S. A. is in part as follows: "A physician * * * in good faith and in the course of his professional practice only, may prescribe, administer and dispense narcotic drugs, * * *."

Section 35, chapter 58, '35 C. S. A., limits the amount of narcotic drugs that may be prescribed through prescribing preparations that contain them but has this specific exception: "Nothing in this section shall be construed to limit the kind and quantity of any narcotic drug that may be prescribed, administered, dispensed, or sold, to any person for the use of any person * * * when it is prescribed, administered, dispensed, or sold, in compliance with the general provisions of sections 28 to 49 of this chapter."

Section 1044, subsection (c), paragraph (1), U. S. C. A., Title 26 of the internal revenue laws of the United States, so far as pertinent is as follows: "Other exceptions.

314

Nothing contained in this chapter shall apply (1) Use of drugs in professional practice. To the dispensing or distribution of any of the drugs mentioned in section 1040 (a) to a patient by a physician, dentist, or veterinary surgeon registered under section 1384 in the course of his professional practice only:''

 There is no evidence that the drugs prescribed by McKay were not prescribed in good faith. No doubt the amount prescribed and the frequency of prescription might be such that in and of itself it would indicate to one skilled in their proper use that one could not possess ordinary skill as a physician and in good faith so frequently prescribe such quantities. But, as heretofore pointed out, the law under which the board acted, contemplates a review of the board's action by a court presumably not expert in medical matters, with authority in the court to determine whether the board regularly pursued its authority or abused its discretion. Without testimony by an expert the court cannot determine the limits of proper treatment in good faith of one possessing ordinary skill, nor can it assume that the board members out of their own individual knowledge and skill correctly fixed the limits within which one might prescribe in these particular cases and be within the bounds of ordinary care and skill so that good faith might be presumed, and beyond which good faith and ordinary skill could not both be successfully asserted. Such matters being only within the knowledge of experts must be shown by testimony of experts appearing in the record.

 It is charged that various of the prescriptions in question were not given in good faith, but for the satisfaction of the patient's addiction, and contrary to the federal narcotic laws. If that be true there is a forum in which the guilt or innocence of the offender may be determined. If convicted in such forum his license may be revoked under the authority of *White v. Board of Medical Examiners, supra.* But until such conviction, the propriety of prescribing for such a purpose is to be determined, not

by the board asking and answering the question of whether some statute or regulation pursuant thereto has been violated, but by asking and answering the question of whether, aside from any law or regulation, the diagnosis and treatment was such as one possessed of ordinary skill in the exercise of ordinary care in applying his skill with the object of promoting the patient's physical well being might make and prescribe. This fact is susceptible of proof by experts in such matters, but we find no such proof in the record. On the contrary, the board found malpractice in the case of Leonard Bell that consisted in nothing relating to diagnosis or treatment but in failing "to state the true reason for which the drugs were being administered * * * and without disclosing that it was for the treatment of drug addiction." The malpractice found in the case of Irene Swan was in dispensing the quantities of drugs shown by the evidence for satisfying her addiction. That she was, besides being an addict, in a seriously and probably incurably diseased condition, which under the evidence probably was cancer of the bladder, cannot be doubted. It does not appear in the evidence that such treatment for a patient in her condition was not proper, judged by sound and recognized medical standards. The board says that in its opinion it was not, but until there was competent evidence to support it, the board was not authorized to form such an opinion and exceeded its authority in so doing. The board further found, without regard to any matters of diagnosis or treatment, that writing prescriptions to be delivered in McKay's absence from the state and in prescribing morphine in powdered form, the dose to be approximated by the patient, constituted malpractice. We find no evidence that in cases and under circumstances such as those in which this was done that it was not within the limits of reasonable discretion nor that it was a departure from what might be done by one possessed of reasonable skill in the exercise of ordinary care. Dr. Arneill testified that he thought it bad judgment; that he had never done it, but would have con-

fidence in McKay if he did it. Dr. Howard was asked if he went away whether he would leave prescriptions with his secretary for future delivery, and he answered: "We have those cases of cancer of the bladder that we do."

With respect to one James A. Brown, the board found that the treatment given him while under the care of McKay in the Physicians and Surgeons Hospital for drug addiction was ostensibly for the purpose of curing him, but in fact merely to satisfy his addiction. McKay, who had been engaged in treating patients for drug addiction for nearly fifty years, testified as to the nature of his treatment and no one claiming to be skilled in such matters testified that it was not proper in that case. What has been said with respect to no malpractice being shown in writing prescriptions for Leonard Bell and Irene Swan applies with equal force to certain prescriptions written for Brown and charged to constitute in his case malpractice.

The finding of the board was further to the effect that all of the foregoing acts which it found constituted malpractice also constituted immoral, unprofessional and dishonorable conduct. It appears that McKay kept full records and had never failed or refused to make them available to officers entrusted with enforcing the narcotic laws. No member of the medical profession testified that the foregoing acts were outside the limits within which skilled and honorable men exercising ordinary care might operate in the practice of their profession; no recognized canons of ethics are shown by the evidence of which such acts would constitute a violation, even if that were a matter for the board's consideration which this court in *Sapero v. State Board,* 90 Colo. 568, 11 P. (2d) 555, held it is not, or at least that a mere violation of canons of ethics not amounting to a breach of legal duty does not constitute a sufficient ground for revocation of a license. In that case it was held that conduct to be unprofessional or dishonorable must amount to a breach of legal duty. Since all the acts here relied upon as constituting such conduct relate to patients of McKay and to his

manner of treatment, in the absence of evidence showing what a physician of reasonable and ordinary skill, applying it with ordinary care in the diagnosis and treatment of the patient involved would have done, or should have done, the record furnished no factual standard for the board's conclusion and no standard for this court to determine whether the acts charged amounted to a breach of the legal duty which a physician owes to his patient and to society in the practice of his profession.

The quantities of drugs dispensed and prescribed by McKay for some of these patients appear to be enormous. One physician who had not specialized in such matters said he had known of cases requiring ten or twelve grains a day but that he had not seen cases that were real addicts. The action of the trial court apparently was based largely on the quantity dispensed and prescribed, but even this was magnified by his assumption in his findings of the prescription of 4,750 grains of morphine for one patient within a period of ninety days whereas the record shows merely this number of tablets, 220 of which were 1-6 grain tablets and the remainder ¼ grain tablets. Even this seems a huge quantity to a layman, but if it is so excessive from a medical standpoint as in and of itself to negative the existence of ordinary medical skill and care in its exercise by one who authorizes such quantities to be used, then there should be no difficulty in procuring competent expert testimony to establish that fact. We cannot say to what extent a miscalculation by the trial judge, by which he finds in effect the prescription for one patient of 52 grains of morphine a day for 90 days, whereas the record shows only 13 grains per day, may have influenced his judgment.

We think the court was correct in its finding that the board had jurisdiction of the subject matter. We think it was in error in not holding that the court was without jurisdiction to enter the order revoking McKay's license because a writ of certiorari raises not only the question of jurisdiction of the subject matter but also

the question of whether the board regularly pursued its authority or greatly abused its discretion. The board has jurisdiction to enter an order revoking a license only when such order is based on competent evidence, and greatly abuses its discretion when it enters an order without evidence to support it. "It must follow from what has been said of the power of the court to consider abuse of discretion, that it must in some cases consider the evidence in order to determine whether the facts shown come within the proper definition of that term as used in the statute, and consequently, the board, when requested by the respondent, ought, we think, to permit and facilitate the taking of testimony in shorthand and its incorporation into the record." *Dilliard v. State Board,* 69 Colo. 575, 196 Pac. 866.

The judgment is reversed and the trial court is directed to refer the matter back to the board for such further proceedings, if any, as it may deem advisable, not inconsistent with the views herein expressed.

Mr. Justice Holland not participating.